## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM "SAM" MCCANN and<br>BRUCE ALAN MCDANIEL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 18-cv-03115 |
| v. | ) ) | |
| | ) | Judge Andrea R. Wood |
| WILLIAM E. BRADY, in his official capacities<br>as Minority Leader of the Illinois State Senate,<br>Leader of the Illinois Senate Republican<br>Caucus, and Senate Leader of the Illinois<br>Republican Party, and the ILLINOIS SENATE<br>REPUBLICAN CAUCUS, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs William "Sam" McCann, an Illinois State Senator, and Bruce Alan Mcdaniel, a

registered voter from the district that McCann represents, have brought this suit against

Defendants William E. Brady (in his official capacities as Minority Leader of the Illinois State

Senate, Leader of the Illinois Senate Republican Caucus, and Senate Leader of the Illinois

Republican Party) and the Illinois State Republican Caucus,[1] alleging that Defendants denied

McCann access to certain Resources[2] in violation of Plaintiffs' rights under the First and the

---

[1] For purposes of this Memorandum Opinion and Order, the Court uses the term "Minority Caucus" to refer to "that group of Senators from other than the 'majority caucus,'" as defined under Illinois Senate Rule 1-16. (Corrected First Am. Compl. ("CFAC") ¶ 12, Dkt. No. 5.) The Court uses the term "Illinois Senate Republican Caucus" to refer to the association of persons named as a Defendant in this action. The parties use both terms in their filings without clearly defining them. Plaintiffs indicated during the initial motion hearing on May 2, 2018 that, because there is no member of the Illinois State Senate who does not identify himself or herself as a member of either the Republican Party or the Democratic Party (aside from McCann), they believe that the Illinois Senate Republican Caucus is the functional equivalent of the Minority Caucus.

[2] The Court uses the term "Resources" to refer to those financial, staffing, and operational resources appropriated by the Illinois General Assembly for which the Minority Leader has been delegated the authority to allocate to Senate committees and members.

Fourteenth Amendments to the United States Constitution. Now before this Court are Plaintiffs'

emergency motion for a temporary restraining order (Dkt. No. 9) and Defendant Brady's motion

to dismiss Plaintiffs' complaint (Dkt. No. 25). For the reasons discussed below, the Court finds

that Plaintiffs' claims against Brady are barred by the doctrine of legislative immunity and

therefore grants Brady's motion to dismiss and denies Plaintiffs' request for emergency injunctive

relief.

## PROCEDURAL BACKGROUND

McCann is the State Senator representing Illinois Senate District 50 and Mcdaniel is a

registered voter residing in that district. (CFAC ¶¶ 3–4.) Brady is a State Senator who also serves

as the Minority Leader of the Illinois Senate, the Leader of the Illinois Senate Republican Caucus,

and the Senate Leader of the Illinois Republican Party. (*Id.* ¶ 5.) McCann and Mcdaniel have

brought this suit against Brady and the Illinois Senate Republican Caucus[3] alleging that, by

denying McCann access to the Resources because he took positions at odds with Republican Party

leadership, Defendants violated McCann's rights to freedom of speech (Count I) and freedom of

association (Count II), and unlawfully retaliated against him (Count V), all in violation of the First

Amendment; and also violated McCann's due process rights under the Fourteenth Amendment

(Count III). Plaintiffs further allege that Defendants violated McCann's constituents' equal

protection rights under the Fourteenth Amendment (Count IV) by creating two classes of voters—

those whose Senators can effectively and fully participate in the legislative process and those

whose Senators cannot do so.

In addition to their complaint, Plaintiffs also filed a motion for a temporary restraining

order, asking this Court to enjoin Defendants from excluding McCann from the Illinois Senate

---

[3] Plaintiffs also initially named the Illinois Republican Party as a Defendant. However, during oral argument on May 11, 2018, Plaintiffs voluntarily dismissed the Republican Party as a Defendant.

Republican Caucus (until he formally leaves the Republican Party) and the Minority Caucus, and to order Defendants to restore McCann's access to the Resources as necessary to perform his duties. In response to the motion for a temporary restraining order, Brady filed a motion to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing, among other things, that he is entitled to legislative immunity. As Brady has invoked a doctrine providing for absolute immunity from suit, the Court took the motion to dismiss under advisement along with the motion for a temporary restraining order on an expedited basis.[4] The parties briefed the matter and the Court held oral argument. This ruling follows.

## FACTUAL BACKGROUND

### I.    Illinois State Senate Organization and Resource Allocation

Plaintiffs' complaint concerns the allocation of funds and other resources by the Illinois state legislature for use by Illinois State Senators.

Legislative power in Illinois "is vested in a General Assembly consisting of a Senate and a House of Representatives." Ill. Const. art. IV, § 1. Regarding Senate leadership, the Illinois Constitution provides that "[o]n the first day of the January session of the General Assembly in odd-numbered years, . . . the Governor shall convene the Senate to elect from its membership a President of the Senate as presiding officer." Ill. Const. art. IV, § 6(b). The Illinois Constitution goes on to define the position of Minority Leader of the Senate as "a member of the numerically strongest political party other than the party to which . . . the President belongs." Ill. Const. art. IV, § 6(c). Illinois Senate Rule 1-10 defines "majority caucus" to include "that group of Senators from the numerically strongest political party in the Senate" as well as "any Senator who is not from the numerically strongest or numerically second strongest political party in the Senate but

---

[4] Oral argument was held on May 11, 2018.

who casts his or her final vote for President of the Senate for the person who is elected President of the Senate." (CFAC ¶ 12, Dkt. No. 5.) Senate Rule 1-16 defines "minority caucus" to mean "that group of Senators from other than the majority caucus." (*Id.*)

With respect to funding, the Illinois Constitution provides that "[t]he General Assembly by law shall make appropriations for all expenditures of public funds by the State. Appropriations for a fiscal year shall not exceed funds estimated by the General Assembly to be available during that year." Ill. Const. art. VIII, § 2(b). The Illinois state budget statute, 15 ILCS 20/50-22(b), provides that "the aggregate appropriations available for legislative operations . . . for each State fiscal year shall be no less than the total aggregate appropriations made available . . . for the immediately preceding fiscal year." Legislative operations include expenditures for Senate operation. *Id.* If the aggregate appropriations made available are insufficient to meet the required level, the budget statute acts as "a continuing appropriation" of the necessary amounts. *Id.* In 2017, the General Assembly appropriated "[t]he sum of $20,603,400, or so much thereof as may be necessary, . . . to meet the ordinary and incidental expenses of the Senate legislative leadership and legislative staff assistants and the House Majority and Minority leadership staff, general staff and office operations." S.B. 6 art. 89, § 15, 100th Gen. Assemb., 2017 Ill. Legis. Serv. P.A. 100-21 (Ill. 2017). Of this amount, "25.7% [was] appropriated to the Senate Minority Leader for such expenditures." *Id.* (*See also* CFAC ¶ 20.)

The General Assembly has also expressly provided for Senate staff. The Illinois General Assembly Staff Assistants Act, 25 ILCS 160/1a, provides that "[t]here shall be such staff assistants for the General Assembly as necessary," that "[o]f the staff assistants so provided, one half the total number shall be for the Senate," and that "[o]f the assistants provided for the Senate, one half shall be designated by . . . the minority leader." When the General Assembly is in

session, "the staff assistants shall be assigned by the legislative leadership of the respective parties

to perform research and render other assistance to the members of that party on such committees

as may be designated." 25 ILCS 160/2(a). When the Assembly is not in session, "the staff

assistants shall perform such services as may be assigned by the President and Minority Leader of

the Senate and the Speaker and Minority Leader of the House of Representatives." 25 ILCS

160/2(b). In addition, the Minority Leader of the Senate shall "adopt and implement personnel

policies for staff assistants under [his] respective jurisdiction and control." 25 ILCS 160/2(c).

Apart from the resources allocated through the Senate leaders, each Illinois Senator is

authorized by statute

> to approve the expenditure of not more than $73,000 per year to pay for "personal
> services", "contractual services", "commodities", "printing", "travel", "operation
> of automotive equipment", "telecommunications services" . . . , and the
> compensation of one or more legislative assistants . . . in connection with his or her
> legislative duties and not in connection with any political campaign.

25 ILCS 115/4.[5] A member of the General Assembly may hire "one or more legislative assistants,

who shall be solely under the direction and control of that member, for the purpose of assisting

the member in the performance of his or her official duties." *Id.*

## II.     Resources Available to McCann

McCann has been a Senator since 2010, with his current term expiring in January 2019.

(CFAC ¶ 23; Aff. of William "Sam" McCann ("Aff.") ¶ 1, Dkt. No. 20.)[6] In 2015, McCann, a

member of the Republican Party at that time, voted to override Illinois Governor Bruce Rauner's

---

[5] The allotted amount is increased "by a percentage increase equivalent to the lesser of (i) the increase in
the designated cost of living index or (ii) 5%." 25 ILCS 115/4.

[6] For the purpose of the motion to dismiss, the Court construes Plaintiffs' complaint in the light most
favorable to them, accepts well-pleaded facts as true, and draws all inferences in Plaintiffs' favor. *See
Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014). The Court has not relied on factual
allegations beyond the complaint in deciding the motion to dismiss. However, while statements in
McCann's affidavit do not form the basis for the Court's decision, the affidavit provides useful context.
The Court also notes that Defendant Brady had the opportunity to respond to the claims in the affidavit in
writing and during the oral argument.

veto of Senate Bill 1229. (CFAC ¶¶ 23, 25.) Rauner, also a Republican, then endorsed and

provided support for McCann's opponent in the 2016 Republican primary elections. (*Id.* ¶¶ 28–

30.) Still, McCann won his primary election and ran unopposed in the general election. (*Id.* ¶ 30.)

However in 2017, another opponent announced his intention to challenge McCann in the 2018

Republican primary elections and secured the endorsement of the Sangamon County Republican

Central Committee. (*Id.*)

On April 19, 2018, after observing that a significant part of the electorate voted for

Rauner's opponent in the Republican primaries for Illinois Governor, McCann announced his

intention to run for Governor as a "new political party candidate" in the general election. (*Id.*

¶ 32.) McCann is currently collecting signatures to qualify for such candidacy; the new political

party he intends to form is the Conservative Party. (Aff. ¶ 2.)

On the day McCann announced his intent to run for Governor, Brady expelled McCann

from the Minority Caucus and the Illinois Senate Republican Caucus, restricted McCann's access

to various Resources, and announced that McCann had left the Minority Caucus and the

Republican Party. (CFAC ¶¶ 35–38, 41.) McCann asserts that he never resigned from any of the

caucuses[7] and that he can no longer effectively perform his duties as a Senator without the

Resources. (*Id.* ¶¶ 36, 39, 41; Aff. ¶ 4.) In particular, McCann alleges that his lack of access to the

Resources negatively impacts his duties as a primary sponsor of 24 bills that are currently moving

through the legislative process, his service on six Senate committees and two sub-committees, and

his representation of his constituents' interests during negotiations regarding the Illinois budget,

which is due to be enacted on May 31, 2018. (CFAC ¶ 44.)

---

[7] McCann claims that he is still a Republican—at least until he completes the requisite legal requirements
to establish a new party. (CFAC ¶ 39.)

The first Resource that McCann claims to have been denied consists of Minority Caucus staff analysis of bills. (CFAC ¶ 41; Aff. ¶¶ 3, 5.) The analysis is available through a secure computer network, which can be accessed by Senators through laptops on the Senate floor, in the Senators' offices, or remotely via personal devices. (Aff. ¶ 5.) The analysis, which covers current bills before the Senate, includes: a laymen's summary of the bills (distilled by a Minority Caucus staffer who is a subject-matter expert); details on proponents and opponents of the bills; and insight into the impact of the bills on citizen's groups, the history of the bills and prior similar bills, and the financial impact of the bills. (*Id.*) According to Plaintiffs, the analysis provides Senators with the equivalent of having been in every committee hearing on every bill, as well as access to expert knowledge and opinions of staffers who serve certain committees exclusively. (*Id.* ¶ 7.) McCann alleges that access to the analysis is crucial to his duties—especially considering that it is not uncommon for one hundred or more substantive votes to be taken in a given day, elected officials lack expertise in certain legislative areas, and legislation is often complex and lengthy. (*Id.* ¶ 6.) He points out that expert analysis is especially crucial during the month of May (the last month of the legislative session) and for the consideration of the new Illinois budget. (*Id.* ¶ 8.)

The second Resource no longer allocated to McCann is the assistance of staffers for the coordination, disposition, and movement of active bills, as well as for the drafting, filing, running, and presenting of McCann's own bills.[8] (CFAC ¶ 41; Aff. ¶ 9.) Minority Caucus expert staffers assist Senators in drafting and coordinating new proposed legislation, as well as with questions relating to bills. (Aff. ¶ 13.) To keep track of legislation, staffers also provide Senators with information and email updates regarding bill status and hearing schedules. (*Id.* ¶¶ 9, 10.) Because

---

[8] McCann claims to have been denied access to about 50 staffers assigned to the Minority Caucus, who are full-time employees of the State of Illinois, paid by taxpayers. (Aff. ¶ 4.)

he no longer has access to these Resources, McCann claims that he has to rely on the publically-available Illinois General Assembly website for scheduling updates, committee hearing schedules, and information on the movement of thousands of bills. (*Id.* ¶¶ 11, 12.) He points out that certain bills (often the contentious ones) are sometimes advanced ahead of schedule, with scheduling changes made on short notice. (*Id.* ¶ 10.) The Illinois General Assembly website might not reflect such changes in a timely manner to allow for actions on bills. (*Id.*) McCann alleges that the sheer volume of active bills moving through the Senate (and its committees and sub-committees) makes it not only impractical, but effectively impossible, to keep track of each bill. (*Id.* ¶ 12.)

Other Resources to which McCann no longer has access include communications and photographer staff, assistance with coordination and execution of "in-district" events and radio communications, and digital platforms (*i.e.*, official officeholder website and Facebook pages). (CFAC ¶ 41; Aff. ¶¶ 14–19.) With regard to those Resources, Minority Caucus staffers help Senators with recording statements on recent Senate actions; drafting and sending out press releases; responding to calls, emails, and on-line comments from constituents; making and collecting photographs for publication; and drafting weekly reviews of the Senators' activities. (Aff. ¶¶ 14, 19.) Minority Caucus staffers also coordinate and schedule various constituent visits, town halls, and fairs. (*Id.* ¶ 17.) McCann claims that the lack of staff support restricts his ability to represent and communicate with his constituents, in part because his webpage was taken down, he has no ability to manage contents of his Facebook page, and his previously assigned staffer is no longer handling communications for him. (*Id.* ¶¶ 14, 15.)

Notably, notwithstanding his laundry list of alleged deprivations, McCann does not allege that he was expelled from the Senate, cannot serve on his assigned committees, cannot participate in debate or voting, or has been barred from introducing new bills. He still has access to his

8

allotted $73,000 per year to expend for various services (including a legislative assistant) and he

does not allege that his assistant has been dismissed or is not being paid. McCann also continues

to have access to the publically-available website for the Illinois General Assembly to keep track

of scheduling and bill movement. (Aff. ¶ 12.) And he does not allege that he has been denied

access to any other resources that might be available to Senators.[9]

## DISCUSSION

To obtain a temporary restraining order pursuant to Federal Rule of Civil Procedure 65,

Plaintiffs must demonstrate: (1) their case has some likelihood of success on the merits; (2) that

no adequate remedy at law exists; and (3) they will suffer irreparable injury if the order is not

issued. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). If these conditions have

been met, then the court must consider any irreparable harm the injunction would cause to the

nonmoving party. *Id.* The court must also consider any consequences to the public from the

injunction. *Id.* The court then weighs all of these factors using a sliding-scale approach. *Id.*

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is

plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*,

742 F.3d 720, 728 (7th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Factual

allegations that are merely consistent with a defendant's liability, conclusory statements, and

formulaic recitations of the elements of a cause of action are, by themselves, insufficient. *Iqbal*,

556 U.S. at 678. In analyzing a Rule 12(b)(6) motion, the Court must construe the complaint in

---

[9] In his motion to dismiss, Brady points out that there are several publically-available resources McCann could use, such as the Legislative Reference Bureau or the Legislative Information System. (Brady's Combined Mem. in Supp. of His Mot. to Dismiss at 2–3, Dkt. No. 26.) Plaintiffs did not dispute these representations in their reply to the motion or during the oral argument.

the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in favor of the plaintiff. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014).

If Defendants' conduct is immunized from suit under the doctrine of legislative immunity, then the claims against them are properly dismissed and, of course, Plaintiffs also would be unable to satisfy the first requirement for a temporary restraining order—*i.e.*, some likelihood of success on the merits. Accordingly, the Court begins its analysis there.

## I.      Legislative Immunity

The doctrine of legislative immunity restricts the ability of individuals to bring private civil suits against legislators for damages or injunctive relief. *See Reeder v. Madigan*, 780 F.3d 799, 802 (7th Cir. 2015); *see also Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 733 (1980). The concept of legislative immunity arises from the Speech or Debate Clause of Article I of the United States Constitution, which states, with regard to members of the United States Congress, that "for any Speech or Debate in either House, they shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1; *see also Reeder*, 780 F.3d at 802. "Two interrelated rationales underlie the Speech or Debate Clause: first, the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch, and second, the desire to protect legislative independence." *United States v. Gillock*, 445 U.S. 360, 369 (1980). But as the privilege was "designed to preserve legislative independence, not supremacy," courts must "apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government." *United States v. Brewster*, 408 U.S. 501, 508 (1972). Legislative immunity is not limited only to the members of the United States Congress—under federal common law, legislators at the state, regional, and municipal levels are also entitled to absolute immunity from suits and liability for their legislative activities.

10

*Reeder*, 780 F.3d at 802 (citing *Bogan v. Scott–Harris*, 523 U.S. 44, 53–54 (1998)); *see also Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 403–04 (1979).

An inquiry into the nature of legislative activity is a functional one. *Id.* The "functional" approach focuses on the nature of the functions lawfully entrusted to an official and the effect that exposure to liability would likely have on the appropriate exercise of those functions. *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988). Whether certain actions are legislative depends on their nature rather than the motive or intent of the official performing them. *Bagley v. Blagojevich*, 646 F.3d 378, 391 (7th Cir. 2011). Legislative immunity extends beyond mere discussion or speechmaking on the legislative floor—the protection applies to all of the legislator's actions within the "sphere of legitimate legislative activity." *Id.*; *see also Reeder*, 780 F.3d at 802. The Supreme Court has held that such activity encompasses acts that are "an integral part of the deliberative and communicative processes by which [legislators] participate in committee and [the legislature's] proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the[ir] jurisdiction." *Reeder*, 780 F.3d at 802 (quoting *Gravel v. United* States, 408 U.S. 606, 625 (1972)). Legislative immunity also extends to actions that are "necessary to prevent indirect impairment of such deliberations." *Id.* at 803. The sphere of legitimate legislative activity thus includes, for example, voting for a resolution, subpoenaing and seizing property and records for a committee hearing, preparing investigative reports, addressing a congressional committee, and speaking before the legislative body in session. *Youngblood v. DeWeese*, 352 F.3d 836, 840 (3d Cir. 2003), *as amended* (Feb. 11, 2004) (collecting Supreme Court legislative immunity cases).

Legislative immunity is not all-encompassing, however. *Gravel*, 408 U.S. at 625. The

Supreme Court "has not hesitated to sustain the rights of private individuals when it found [the

legislature] was acting outside its legislative role." *Tenney v. Brandhove*, 341 U.S. 367, 376–77

(1951). Legislators may engage in many activities that are not immunized from suit. *Brewster*,

408 U.S. at 512–13. For example, the immunity does not extend to political activities (including a

wide range of legitimate errands performed for constituents), accepting bribes, and disseminating

classified or libelous materials. *Youngblood*, 352 F.3d at 840 (collecting Supreme Court cases).

And a legislator's administrative actions are not protected. *Rateree*, 852 F.2d at 950 (stating the

principle and providing examples).

The parties in this case have not cited any Seventh Circuit case addressing the sort of

conduct challenged here—*i.e.*, a legislator allegedly reallocating resources in retaliation for

political dissent by another legislator. But the Third Circuit considered a similar situation in

*Youngblood*. There, the plaintiff, a Pennsylvania state representative, sued two other

representatives, alleging that they retaliated against her for dissenting against party leadership by

allocating the General Assembly's total appropriation for district office staffing in a punitive

manner in violation of her civil rights. *Youngblood*, 352 F.3d at 838, 840. After the district court

denied the defendants' motion to dismiss, the Third Circuit reversed the decision based on a

finding of legislative immunity. *Id.* at 842.

In reaching that conclusion, the Third Circuit first noted that the Pennsylvania General

Assembly had the authority to appropriate funds to be used by representatives for district office

staffing and constituent service programs. *Id.* at 841 (citing Pa. Const. art. III, § 11, "[t]he general

appropriation bill shall embrace nothing but appropriations for the executive, legislative and

judicial departments of the Commonwealth, for the public debt and for public schools"). By

appropriating a lump sum for all representatives' district office-staffing, the General Assembly delegated legislative authority to determine an individual representative's funding to the House of Representatives party leaders. *Id.* The Third Circuit opined that "delegating to the party leadership [was] no different than delegating to a legislative committee completing the allocation process." *Id.* Hence, the party leaders' exercise of that authority was a direct consequence of the appropriation legislation—that is, it was conducted pursuant to the legislative authority implicit in the appropriation legislation itself. *Id.* It was not an extracurricular activity falling outside the scope of the immunity but rather a discretionary policymaking decision implicating budgetary priorities of the House of Representatives. *Id.* at 841–42. As a result, the Third Circuit concluded that the defendants' conduct fell within the sphere of legitimate legislative activity and thus was shielded by legislative immunity. *Id.* at 841. *See also Bogan*, 523 U.S. at 54–56 (holding that mayor's introduction of a budget and signing into law of an ordinance that eliminated the plaintiff's position, as well as city council vice president's voting for the ordinance, were legislative actions where "[t]he ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents").

The Third Circuit's logic in *Youngblood* is informative here. Under the Illinois Constitution, the General Assembly is tasked with making appropriations. *See* Ill. Const. art. VIII, § 2(b). The Illinois General Assembly put aside $20,603,400 "to meet the ordinary and incidental expenses of the Senate legislative leadership and legislative staff assistants" (among other needs) and appropriated 25.7% of that amount "to the Senate Minority Leader for such expenditures." S.B. 6 art. 89, § 15, 100th Gen. Assemb., 2017 Ill. Legis. Serv. P.A. 100-21 (Ill. 2017). Furthermore, regarding the allocation of staff, Illinois statutes specifically provide that one half of

the assistants provided for the Senate "shall be designated by . . . the minority leader" and that while the General Assembly is in session, staff assistants are assigned by "the legislative leadership" to do research and assist members "as may be designated." 25 ILCS 160/1a, 2(a). The General Assembly thus has delegated the task of allocating the Resources to the Senate Minority Leader, among other legislative leaders. The Senate Minority Leader, in turn, has the authority to allocate the Resources according to the agenda and priorities of the Minority Caucus. Similar to the legislators in *Youngblood*, Brady allocated the Resources pursuant to the authority granted to him by Illinois statutes and Senate rules. Brady's decisions regarding how the Resources should be designated for the benefit of the various Senate committees and members, including McCann, falls within the sphere of legislative activity properly protected by legislative immunity.

Indeed, McCann does not challenge Brady's authority to allocate the Resources according to Brady's determination of the best interests of the Minority Caucus and its legislative agenda so much as he takes issue with Brady's motivation for doing so. And as noted above, legislative immunity turns on the function being carried out by the legislator, not his motive or intent. *See Bagley*, 646 F.3d at 391.

Plaintiffs nonetheless argue that 25 ILCS 160/2(a) makes clear that the Resources are assigned generally and not at the discretion of the Minority Leader. They point out that unlike 25 ILCS 160/2(b), which specifically mentions the Minority Leader's discretion to allocate staff tasks when the General Assembly is not in session, 25 ILCS 160/2(a) contains no language regarding discretion. But Plaintiffs' reading of 25 ILCS 160/2(a) ignores that the provision specifically states that the legislative leadership assigns staff to perform research and assistance tasks. Plaintiffs' interpretation also ignores 25 ILCS 160/1a, which specifies that the Minority Leader designates the assistants. Moreover, the Illinois legislature has not just designated the

14

funds to be allocated by its leadership but it has also delineated the minimum amount of funds—

$73,000—to which Senators are entitled without regard to the opinions and priorities of Senate

leadership. *See* 25 ILCS 115/4. So there is an amount of funds to which McCann is entitled

regardless of Brady's determinations (and to which he continues to have access) and another

source of funds and resources for which McCann is dependent on Brady (and which has been

curtailed).

Plaintiffs assert that McCann is still a member of the Minority Caucus under the definition

in Illinois Senate Rule 1-16, and thus Brady should not be permitted to exclude him from it. In

support of their position, Plaintiffs point to *Ammond v. McGahn*, 390 F. Supp. 655 (D.N.J. 1975),

*rev'd on other grounds*, 532 F.2d 325 (3d Cir. 1976), where a member of the New Jersey state

senate and some of her constituents filed an action seeking a preliminary injunction enjoining her

exclusion from the senate political caucus. The state senator attempted to attend caucus

proceedings but was informed that she could not do so because she had been voted out. *Id.* at 659.

The district court determined that the caucus functioned as an arm of the state legislature and was

an essential part of the legislative process in New Jersey—during the caucus sessions, pending

bills were discussed, straw votes were made, bills that did not commend majority were often

withdrawn, and a consent list was prepared by the caucus identifying those bills that would pass

on the floor without debate. *Id.* Noting that the caucus often decided the course of legislation

before it ever reached the Senate floor and so exclusion from the caucus was tantamount to

exclusion from the Senate, the district court held that excluding the plaintiff from the caucus in

retaliation for her criticisms violated her right of free speech. *Id.* at 660.

Plaintiffs' reliance on *Ammond*—a district court case of limited persuasive authority that

was reversed on other grounds by the Third Circuit decades before the Third Circuit's much more

recent opinion in *Youngblood*—is inapposite. Even if McCann is correct that he remains a member of the Minority Caucus regardless of whether he continues to identify himself with the Republican Party (a position that appears to be supported by the plain language of applicable Senate Rules 1-10 and 1-16), the only consequences of his alleged improper "expulsion" from the caucus by Brady involve the allocation (or lack thereof) of Resources that Brady has the authority to allocate. Unlike the plaintiff in *Ammond*, Plaintiffs here do not allege that McCann has been cut off from participation in the legislative process, expelled from the Senate chamber, prohibited from serving on his assigned committees or participating in debates or voting, or barred from introducing any new bills. It cannot be said that McCann's treatment is tantamount to being expelled from the Illinois State Senate.

The Court's conclusion that Plaintiffs may not sue Brady in a private lawsuit for civil damages and injunctive relief based on the sort of conduct alleged here is not meant to suggest that there is no recourse available for individuals aggrieved by legislator conduct no matter how egregious. For example, Illinois legislators are still subject to certain criminal statutes, including those prohibiting official misconduct and legislative official misconduct. *See, e.g.*, 720 ILCS 5/33-3 (criminal statute prohibiting official misconduct), 720 ILCS 5/33-8 (criminal statute prohibiting legislative official misconduct); 5 ILCS 282/15 (empowering the Illinois Attorney General to "file an action in circuit court on behalf of the people of Illinois against an elected official who has, by his or her violation of Article 33 of the Criminal Code . . . or violation of a similar federal offense, injured the people of Illinois"). In addition, the State Officials and Employees Ethics Act, 5 ILCS 430/1-1 *et seq.*, and the Illinois Governmental Ethics Act, 5 ILCS 420/1-101 *et seq.*, impose additional prohibitions on legislators' conduct, with the Office of the Legislative Inspector General granted jurisdiction over the members of the General Assembly to

investigate "allegations of fraud, waste, abuse, mismanagement, misconduct, nonfeasance, misfeasance, or violations of [the State Officials and Employees Ethics Act] or other related laws and rules." 5 ILCS 430/25-10(c).[10] And of course, the conduct of legislators is subject to scrutiny and rebuke by their constituents and fellow legislators, who wield the power of the political process.

In sum, having found that Brady's alleged conduct falls within the sphere of legislative immunity, the Court dismisses the claims against him with prejudice and denies Plaintiff's request for a temporary restraining order against him.

## II. Claims against the Illinois Senate Republican Caucus

One additional matter warrants attention. Brady is not the only defendant in this lawsuit. Plaintiffs also have sued the Illinois Senate Republican Caucus. It is unclear, however, whether Plaintiffs seek to impose a temporary restraining order against that party apart from the relief they have requested as to Brady. Plaintiffs' allegations in the complaint and their arguments in support of a temporary restraining order are framed in the context of Brady's conduct only. Plaintiffs have not attributed any allegedly injurious conduct to the Illinois Senate Republican Caucus. Moreover, during the May 11, 2018 hearing, Plaintiffs' counsel stated his belief that Brady was the person responsible for the decisions leading to McCann's injuries. And Plaintiffs have not argued that the Illinois Senate Republican Caucus should be treated differently from Brady with respect to the issue of legislative immunity, nor have they provided any authority to support such a distinction.[11] Regardless of Plaintiffs' intent, however, there is nothing in the record to support issuing a

---

[10] The Court has no opinion on whether any of these statutes would apply in the present case but references them only to illustrate that legislative immunity has its limits.

[11] While Plaintiffs have filed a proof of service for the Illinois Senate Republican Caucus (*see* Dkt. No. 17), that party has not yet appeared in this action nor did it participate in the briefing or argument of the motion to dismiss or motion for a temporary restraining order.

temporary restraining order against the Illinois Senate Republican Caucus in light of the dismissal of claims against Brady. To the extent there is an argument that might place the claims against the Illinois Senate Republican Caucus outside the scope of legislative immunity, it has not been presented to this Court. Accordingly, the motion for a temporary restraining order is denied as to the Illinois Senate Republican Caucus as well.

Nonetheless, as the Illinois Senate Republican Caucus has not appeared in this case (and thus did not formally join in Brady's motion to dismiss) and given the lack of clarity regarding whether Plaintiff seeks to pursue claims against the Illinois Senate Republican Caucus distinct from those asserted against Brady, final judgment shall not issue at this time. Plaintiffs may, if they so desire, seek entry of a final judgment as to Brady pursuant to Federal Rule of Civil Procedure 54(b), voluntarily dismiss their claims against the Illinois Senate Republican Caucus so that all pending claims in this case would be resolved and final judgment may enter, or continue to pursue their claims against the Illinois Senate Republican Caucus, assuming they have a good-faith basis to do so in light of the Court's ruling.

## CONCLUSION

For the reasons stated above, Defendant Brady's motion to dismiss (Dkt. No. 25) is granted and Plaintiffs' claims against Defendant Brady are dismissed with prejudice. Plaintiffs' motion for temporary restraining order (Dkt. No. 9) is denied. However, for the reasons stated above, final judgment shall not issue at this time.

ENTERED:

Dated:  May 18, 2018

_____
Andrea R. Wood
United States District Judge

18